**JUDGE FAILLA**

Lax & Neville LLP
Barry R. Lax (BL1302)
1450 Broadway, 35th Floor
New York, New York 10018
Telephone: (212) 696 – 1999
Facsimile: (212) 566 – 4531

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

STEVEN GOLDIN, as Co-Executor of Bernice
Goldin's Estate, on behalf of Bernice Goldin's IRA, and
as Co-Trustee of the Paul Goldin Marital Trust B, and
ROCHELLE GOLDIN, as Co-Executrix of Bernice
Goldin's Estate, on behalf of Bernice Goldin's IRA,
and as Co-Trustee of the Paul Goldin Marital Trust B,

Plaintiffs,

vs.

STATE STREET BANK AND TRUST COMPANY,

Defendant.

------------------------------------------------------------------X



Index No. _____

**COMPLAINT**

**Jury Trial Demanded**

Plaintiffs Steven Goldin, as Co-Executor of Bernice Goldin's estate on behalf of

Bernice Goldin's IRA, and as Co-Trustee of the Paul Goldin Marital Trust B, and Rochelle

Goldin as Co-Executrix of Bernice Goldin's estate, on behalf of Bernice Goldin's IRA, and,

as Co-Trustee of the Paul Goldin Marital Trust B (collectively "Plaintiffs" or the "Goldins"),

by and through their attorneys, Lax & Neville LLP, complaining of the defendant State Street

Bank and Trust Company ("State Street" and/or "Defendant") set forth and allege as follows:

## INTRODUCTION

1.      Plaintiffs bring this action against State Street for breach of contract, negligence and/or gross negligence, negligent misrepresentation, unjust enrichment, breach of fiduciary duty and aiding and abetting breach of fiduciary duty based upon State Street's disregard of its custodial duties and obligations that ultimately resulted in damages to the Plaintiffs.

2.      State Street was the independent third-party custodian for Plaintiffs' investment accounts, which were managed by TAG Virgin Islands, Inc. ("TAG").  State Street, as custodian for Plaintiffs' investment accounts, was tasked with the duty to safeguard Plaintiffs' property and funds, execute TAG's instructions, settle transactions, transfer and disburse funds, and provide accurate account statements to Plaintiffs.

3.      State Street breached its fiduciary duties as custodian for Plaintiffs' TAG-managed accounts by engaging in negligence, gross negligence and willful misconduct in maintaining custody of Plaintiffs' assets and settling and executing trades.

4.      In dereliction of its duties as custodian, State Street:

a)      listed fake CUSIP[1] numbers on Plaintiffs' monthly account statements;

b)      failed to settle and execute transactions;

c)      issued account statements to Plaintiffs that inaccurately described investments and valued investments;

d)      issued account statements to Plaintiffs that listed transactions that were never executed, settled, received or disbursed;

e)      settled numerous fraudulent transactions, including, but not limited to,

---

[1] CUSIP is the abbreviation for Committee on Uniform Security Identification Procedures, which is an alphanumeric code that identifies North American securities, including any and all registered United States and Canadian companies, as well a United States government and municipal bonds.  Standard & Poor's operates the CUSIP system, which is owned by the American Bankers Association.

fake promissory notes and subordinated notes, which were submitted by TAG;

    f)      failed to obtain the necessary documents and information required to settle purchases of securities that, according to TAG, purportedly occurred;

    g)      disbursed funds to third parties for securities purchases even though the securities were sometimes never received by State Street, or received months later;

    h)      failed to monitor subcustodians; and

    i)      misrepresented the location of Plaintiffs' assets due to lack of knowledge as to where the assets were actually held.

5.      State Street knew or should have known that TAG, and its owners and agents, James Tagliaferri ("Tagliaferri") and Patricia Cornell ("Cornell"), were orchestrating a massive fraud and breaching the duties they owed to Plaintiffs as their investment adviser, based upon the fake promissory notes that it received and processed, as well as other irregularities in the transactions, including false CUSIP numbers.

6.      By engaging in such conduct, State Street aided and abetted the fraud perpetrated on Plaintiffs by TAG, and TAG's owners and agents, Tagliaferri and Cornell.

7.      As a direct result of State Street's conduct, Plaintiffs have suffered damages in an amount to be determined at trial, but not less than $4,500,000.

## THE PARTIES

8.      At all relevant times, Plaintiff Steven Goldin is an individual currently residing in Dix Hills, New York. Steven Goldin is the son of Bernice and Paul Goldin. Steven Goldin is a Co-Trustee of the Paul Goldin Marital Trust B and is Co-Executor of Bernice Goldin's estate. Bernice Goldin passed away on February 9, 2012.

9.      At all relevant times, Plaintiff Rochelle Goldin is an individual currently residing Huntingdon Valley, Pennsylvania.  Rochelle Goldin is the daughter of Bernice and Paul Goldin. Rochelle Goldin is a Co-Trustee of the Paul Goldin Marital Trust B and is Co-Executrix of Bernice Goldin's estate.

10.     State Street is a trust company organized under the laws of the Commonwealth of Massachusetts, and maintains its principal place of business at One Lincoln Street, Boston, Massachusetts 02111.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action, pursuant to 28 U.S.C. § 1332, in that the action involves a dispute between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

12.     Venue is proper, pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, and State Street is subject to personal jurisdiction in this District.

## FACTUAL ALLEGATIONS

### TAG Serves As Investment Adviser For Plaintiffs' Accounts

13.     TAG was founded in 1985 by Tagliaferri, who, at all relevant times, was the President of TAG.  Tagliaferri owned 51% of TAG, and Tagliaferri's former wife, Cornell, owned the remaining 49%.

14.     Plaintiffs have known Tagliaferri for at least twenty (20) years.  During the 1980s, Bernice Goldin's deceased husband Paul Goldin opened two (2) accounts with TAG, an IRA and an individual account.  In February 2003, Paul Goldin passed away and the estate proceeds were transferred into a TAG account held in the name of the Paul Goldin Marital Trust B with Bernice

Goldin, Steven Goldin and Rochelle Goldin as co-trustees.  Furthermore, upon Paul Goldin's death, the Paul Goldin IRA converted to the Bernice Goldin IRA.  Based upon the twenty (20) plus year relationship between Paul Goldin and Tagliaferri, Plaintiffs trusted and relied upon TAG, Tagliaferri and Cornell for investment advice and financial management and services.

15.     TAG managed a portion of Plaintiffs' assets, pursuant to Investment Management Agreements, which provided that TAG would provide investment management services for Plaintiffs and required that "[a]ll transactions in the Portfolio shall be carried out through such custodian(s) as the Client shall designate[]."

**State Street Served As Custodian For Plaintiffs' Accounts**

16.     Pursuant to Securities and Exchange Commission ("SEC") Rule 206(4)-2, 17 § 275.206(4)-2, under the Investment Adviser's Act of 1940, 15 U.S.C. § 80b, registered investment advisory firms, such as TAG, are required to use a qualified custodian for customer accounts.  Pursuant to SEC Rules, the qualified custodian must hold the investment advisor firms' funds or securities in an account under each client's name or under the adviser's name as agent for the client.  Moreover, the qualified custodian must provide periodic accurate account statements to clients for whom it, or its subcustodians, holds assets.

17.     State Street served as custodian of Plaintiffs' funds in order to safeguard their financial assets and ensure that there was a fair and arms-length business relationship between TAG and Plaintiffs.  By agreeing to safeguard Plaintiffs' assets, State Street was required to facilitate and monitor the movement of assets, hold assets and securities with proper valuations, settle all purchases, sales and deliveries,[2] administer corporate actions for securities, maintain and manage cash transactions, and deliver reports or account statements which list any and all

---

[2] Settlement occurs when a custodian takes delivery and receipt of securities against the agreed upon amount when the securities are bought and sold.

account activity to all customers.

18.     State Street touts its expertise as a custodian by stating the following on its website:

> **Safekeeping:**   We provide world-class custody and recordkeeping of assets through our relationships with local depositories, subcustodians and agent banks.
>
> **Network Management and Information Services:**   Our network of providers and market infrastructures is managed with an emphasis on quality, risk management, transparency, market intelligence and leadership.
>
> **Reporting Services.**   Our reporting capabilities provide you with real-time views into the details of our custody transactions, including trade status, asset positions, cash forecasting, intraday cash reporting and daily and monthly priced holdings . . . We work closely with you to create a customized solution, delivering operational efficiencies and greater transparency to your business.

http://www.statestreetglobalservices.com/wps/portal/internet/ssgs/home/capabilities/custody/overview (last viewed May 10, 2013).

**TAG's Scam**

19.     During 2007, over twenty years since Paul Goldin initially invested with TAG, Tagliaferri relocated TAG's principal office to St. Thomas in the Virgin Islands, which is designated by the United States Treasury Department's Office of the Comptroller of the Currency as a High Intensity Financial Crime Area.   State Street was on notice of TAG's relocation to a High Intensity Financial Crime Area, and was required to transact business with TAG, Tagliaferri and Cornell with a higher degree of care, paying greater attention to the possibility of financial crimes.

20.     In 2007, TAG, Tagliaferri and Cornell began implementing the first element of their scam by changing the investment strategy for Plaintiffs' accounts, which was drastically different in nature from TAG's previous investment strategy.   Plaintiffs did not receive notification of this drastic change of investment strategy.   Indeed, in mid-2007, Tagliaferri and

Cornell, both of whom had absolute discretion to invest Plaintiffs' funds, began to liquidate Plaintiffs' conservative municipal bond and blue-chip stock positions and began a fraud by investing the proceeds from those sales to purchase highly speculative stocks in virtually worthless micro-cap companies and in highly speculative TAG Affiliated Companies[3] under the pretense of convertible note instruments.   For example, Tagliaferri and Cornell unlawfully invested Plaintiffs' funds into a struggling horse-racing private company (IEAH), a failing technology company (Protein Polymer Technologies, Inc.), a failing business intelligence company (Conversion Services), and in multiple unsecured loans to individuals.

21.     These notes, with some appearance of legitimacy, were a fiction designed by TAG, Tagliaferri and Cornell to defraud the Plaintiffs, and other customers.   Pursuant to the terms of the notes, TAG was the Payee and the TAG Affiliated Companies were the Makers who purportedly promised to repay TAG the principal plus interest on the maturity date.   In furtherance of the scam, most of the notes were drafted in a way to make Plaintiffs and TAG's other customers, the parties that funded these notes, not the Payees; thereby, purposely attempting to limit those customers' ability to recover against the Maker.

22.     Furthermore, upon information and belief, although Plaintiffs are not referenced in the notes, there are documents that purport to be sub-notes for each convertible note, which reference the original note and its terms, and promise to repay Plaintiffs the amount that they individually loaned to the TAG Affiliated Company.   However, these sub-notes were only executed by TAG, not the Makers or Plaintiffs, thereby, making them essentially worthless. TAG, Tagliaferri and Cornell never provided copies of the convertible notes or sub-notes to

---

[3] IEAH Corporation, IEAH Stables, Inc., International Equine Holdings Inc. (collectively referred to as "IEAH"), Protein Polymer Technologies, Inc., Crossing at Fleming, Fleming, JTS Corporation, 1920 Bel Air, LLC, Conversion Services International, Inc., Equities Media Acquisition Corp., Fund.com Inc., Gerova Financial Group Ltd., National Digital Medical Archive, Inc., Rineon Group, Inc., and Stanwich Absolute Return Ltd. will collectively be referred to as the "TAG Affiliated Companies."

Plaintiffs.

23.     The second element of the scam related to the discretion of TAG, as Payee, to convert these notes on or before the maturity dates to stock in the TAG Affiliated Companies to which it transferred Plaintiffs' funds.   Specifically, TAG, Tagliaferri and Cornell had the following options: (i) to demand repayment of the loans with interest on the maturity dates for certain notes; (ii) to recover the collateral under the note which typically comprised of some ownership interest, like race horses, etc.; or (iii) to convert the Plaintiffs' interest from creditor to common shareholder through the issuance of common stock in exchange for the loan amount on or before the maturity date, which was undoubtedly the least desirable option for the Plaintiffs. In most, if not all instances, TAG, Tagliaferri and Cornell converted Plaintiffs' notes to valueless stock in the TAG Affiliated Companies, but State Street listed these notes on Plaintiffs' monthly account statements at par value.   In exchange for transferring their customers' funds to the TAG Affiliated Companies, TAG, Tagliaferri and Cornell would initially receive a commission, usually five percent (5%).  TAG, Tagliaferri and Cornell would then receive an additional five percent (5%) commission for their conversion of debt to equity (note to stock), which they did, in most, if not all instances.  This conversion was never in the best interests of Plaintiffs as it provided the least amount of corporate protection and the stock was almost always essentially worthless.

24.     TAG, Tagliaferri and Cornell knew that the TAG Affiliated Companies never intended on repaying the debts due under the notes.  Indeed, because the debts were never intended to be repaid, there was no consideration given to Plaintiffs for purchasing these notes. The only parties that benefited from these transactions were TAG, Tagliaferri and Cornell, which received a commission on all monies forwarded to such companies, and the TAG Affiliated

Companies, which received loans they did not intend to pay back.  Furthermore, these additional commissions were undisclosed to the Plaintiffs and in direct contravention to the Investment Management Agreements, which clearly set forth the management fee schedule, and did not allow TAG, Tagliaferri and Cornell to earn additional undisclosed commissions on Plaintiffs' accounts.

25.     The third element of the scam related to TAG, Tagliaferri and Cornell earning unwarranted management fees on artificially inflated positions contained in Plaintiffs' account statements.  Even though many of the positions held in Plaintiffs' accounts were worthless, TAG, Tagliaferri and Cornell fraudulently inflated the values of the positions to State Street, the custodian of Plaintiffs' accounts, which would issue monthly statements to Plaintiffs that contained inaccurate and fraudulently inflated valuations of the securities maintained in the accounts.  Because the valuations were artificially inflated by TAG, Tagliaferri and Cornell, they were able to charge an equally artificially inflated management fee on these worthless assets.

26.     This entire scam as described above was summarized in an Indictment filed against Tagliaferri by the United States Attorney For The Southern District Of New York in the matter bearing the caption *United Stated of America vs. James Tagliaferri,* Index No. 13-cr-115 ("SDNY USA Indictment"), filed on February 21, 2013.  According to the SDNY USA Indictment, TAG clients' accounts were maintained at third-party financial institutions.  Upon information and belief, one such third-party financial institution was State Street.  Tagliaferri would send instructions to State Street to transfer funds out of Plaintiffs' accounts and would effect withdrawals to make investments on behalf of TAG's clients.

27.     Also, according to the SDNY USA Indictment, Tagliaferri caused some client funds to be transferred from client accounts to an attorney trust account maintained in the

Southern District of New York.  The transfers appeared on account statements sent to clients as transfers for purposes of purchasing securities, including the promissory notes.  Other portions of clients' funds were diverted to a TAG bank account in the United States Virgin Islands, which were used to fund undisclosed compensation that Tagliaferri received from the TAG Affiliated Companies in exchange for causing his clients' funds to be invested in such companies.  The account statements clients received did not reference the transfers which were diverted to the TAG Virgin Islands bank account.

28.     Furthermore, the SDNY USA Indictment states that Tagliaferri used the undisclosed fees to make transfers to himself, and TAG's co-owner, Cornell, to pay credit card bills, pay salaries and overhead.  Specifically, the SDNY USA Indictment states, "Tagliaferri transferred to himself at least $1.7 million from the TAG Virgin Islands Account and the co-owner of TAG [Cornell] received approximately $1.6 million from this account."  Moreover, according to the SDNY USA Indictment, Tagliaferri executed these transactions in order to generate money to meet the cash needs of TAG and other companies with which Tagliaferri was affiliated.  As such, Tagliaferri used his clients' funds for his own interests, rather than his clients' interests.  Indeed, the SDNY USA Indictment references an April 3, 2010 letter from Tagliaferri to one of the TAG Affiliated Companies stating, "I'm trying to help you.  The [affiliated company's] shares you transferred are being sold to clients.  With those proceeds, you're buying back your own notes."  In that same e-mail, he demanded when he would receive money from the affiliated company as it was needed to "take away the urgency of those clamoring for their money."  According the SDNY USA Indictment, between 2007 and 2010, Tagliaferri collected at least $4.3 million in investment advisory fees from various TAG clients.

29.     At or about the same time of the filing of the SDNY USA Indictment, the

Securities and Exchange Commission ("SEC") filed an Order Instituting Administrative Proceedings Pursuant To Section 15(b)(6) of The Securities Exchange Act Of 1934, Section 203(f) of The Investment Advisers Act of 1940, And Section 9(b) of The Investment Company Act of 1940 And Notice Of Hearing ("SEC Administrative Proceeding"), against Tagliaferri on February 21, 2013.  It alleges that Tagliaferri used his discretionary authority to invest clients' funds in highly illiquid securities, including promissory notes issued by closely-held companies, which were nothing more than holding companies through which Tagliaferri's business associates could make personal and business transactions.  As a result of these fraudulent transactions, TAG received at least $1.75 million in cash, as well as approximately 500,000 shares of Fund.com stock.

30.     Similarly according to the SEC Administrative Proceeding, as TAG clients' notes neared or passed maturity, some clients complained about not having received payments due under the notes.  In order to appease those clients' request, Tagliaferri caused other clients to invest in microcap and other thinly-traded public companies in order to raise money to pay the interest and/or principal due to the clients who were demanding payment.  The microcap and other thinly-traded public companies included Fund.com, Recovery Energy, Rineon and Muscato Group, Inc.  Tagliaferri knew, or was reckless in not knowing, that TAG clients were unaware that they were purchasing certain of these securities.  Indeed, the SEC Administrative Proceeding, references an e-mail Tagliaferri sent to one of the TAG Affiliated Companies on April 4 and 5, 2010 which explained that his motivation for causing clients to invest in the thinly-traded companies, such as Fund.com, was to pay off other clients on their matured notes. The e-mail states:

> You and [your brother] gave me assurances TAG [], upon the Weston closing, would receive $125MM.  We even provided money in December to effect that

closing.  I've been waiting patiently ever since.  Well, you've closed.  Where is the $125MM.  As you are aware, this money was earmarked to clear all of the notes and other issues facing us both.  Some was to go to IEAH (you were to receive 10% fee).  So, some of the FNDM shares were diverted to IEAH until the Weston money arrived.  By the way, I was given the green light to distribute these shares as I saw fit.  *Moreover, many of the FNDM shares were sold for your account with the proceeds used to purchase Geomas, or Drexel, or Stanwich, etc. notes*.  I ask again.  Where's the $125MM.  As I mentioned previously, if I got $5MM-$10MM now and the balance in pieces over a 3 month timeframe, I can probably stave off disaster.  Can you give me the $5MM-$10MM immediately? (emphasis added).

## State Street's Obligations Regarding Plaintiffs' Accounts

31.     State Street, as custodian, assumed various duties and responsibilities to Plaintiffs. These duties and responsibilities included, but are not limited to, establishing a custodian account, holding and safeguarding Plaintiffs' funds and investments, executing TAG's instructions, accurately reporting account holdings and transactions, and disbursing funds from Plaintiffs' accounts in exchange for timely receipt of securities in good form.

32.     Moreover, State Street was required to provide account statements to Plaintiffs which referenced all transactions that were effectuated in Plaintiffs' accounts, as well as a list of all the securities, and their current market value, held in Plaintiffs' accounts.

33.     Further, State Street was able to deposit some of Plaintiffs' funds with any centralized securities depository system, or independent sub-custodian, rather than maintain custody of the assets itself.  State Street was not permitted to deposit Plaintiffs' securities in TAG's custody, as doing so would violate SEC Rule 206(4)-2, 17 C.F.R. § 275.206(4)-2, which, as described above, required TAG, as an investment advisory firm, to use a "qualified custodian," such as State Street, for customer accounts.

34.     In exchange for these duties and responsibilities, State Street charged a custodial fee which was computed based on a percent of the value of Plaintiffs' assets held by State Street,

usually in the amount of five basis points annually, which was payable on a quarterly basis.

35.     State Street enabled TAG to implement its unlawful scheme by carrying out TAG's instructions and performing its custodial duties in a matter that was incompatible with its obligations and duties that it owed to its clients.   Through its actions and inactions described herein, State Street violated the custodial duties and responsibilities it owed to Plaintiffs, and therefore, is liable to Plaintiffs for the damages sought herein.

**State Street Disburses Plaintiffs' Funds For Securities That**
**Were Not In Good Form And For Facially Irregular Transactions**

36.     As custodian, State Street was only able to disburse funds in exchange for timely receipt of securities in good form.   Contrary to this duty, State Street routinely disbursed Plaintiffs' funds to TAG in exchange for securities that were facially irregular as they were not in good form, and for securities that were valueless.

37.     When processing and settling the TAG transactions, State Street knew, or should have known, that after 2007, the type of transactions in Plaintiffs' accounts changed dramatically and was a red flag for a fraud.

38.     For example, as part of TAG's changed investment strategy, TAG issued instructions to State Street to disburse funds from Plaintiffs' accounts in order to purchase speculative stocks, notes, personal loans and mortgages.   When State Street received these instructions, State Street wired money out of Plaintiffs' accounts and reported on Plaintiffs' account statements that the underlying investments were purchased.   However, on numerous occasions, State Street failed to properly settle transactions when it received securities and notes that were in improper form for Plaintiffs' accounts in exchange for disbursements out of the accounts.

39.     Further, State Street would disburse funds from Plaintiffs' accounts, and in

exchange, take custody of fake subordinated notes which were issued and signed by TAG and/or Tagliaferri, when such notes needed to have been issued and signed by the purported company-issuers.  In other instances, State Street disbursed Plaintiffs' funds to TAG in exchange for purported promissory notes issued by TAG Affiliated Companies, as the maker, that were not in good form because they were not signed.

40.     In other instances, some of the subordinated notes referenced "Master Notes" which would have been critical for the custodian to possess as the "Master Notes" would govern the terms of the subordinated notes.  Usually, State Street failed to obtain a copy of the "Master Notes."

41.     The subordinated notes are fake on their face, and could not have automatically been processed without the assistance and review of State Street's employees.  As such, when State Street reviewed the notes, it became aware of TAG's deception and thereafter, continued to process the fake subordinated notes.

42.     Based upon the fiduciary duty State Street owed to Plaintiffs, upon receipt of the fake notes, State Street should have informed Plaintiffs about TAG's deceptive practices.

43.     Upon information and belief, if State Street had inquired into the legitimacy of the transactions, it would have detected the fraudulent nature of them, and would not have disbursed Plaintiffs' funds.

**State Street Disburses Plaintiffs' Funds Without Receiving Any Value In Return**

44.     As custodian, State Street was required to take custody of securities received in a timely fashion in exchange for disbursement of Plaintiffs' funds.  Often times, however, State Street failed to take timely receipt of the securities received.  State Street settled many transactions, and disbursed Plaintiffs' funds for purchases, without timely receiving possession

of stock certificates. Despite this, State Street reported to Plaintiffs, through the account statements, that they held stock in the companies.

45.     For example, State Street disbursed Plaintiffs' funds for the purpose of buying various thinly-traded microcap companies, including, but not limited to Fund.com, Conversion Services, Rineon Group, Inc. and Gerova Financial Group Ltd. State Street disbursed Plaintiffs' funds without taking timely possession of the stock share certificates. Upon information and belief, when State Street failed to receive timely delivery of the stock share certificates it did not list the certificates on the account statements sent to Plaintiffs, nor did it disclose the failure to deliver issue with Plaintiffs.

46.     Additionally, State Street listed notes and valued the notes on the account statements issued to Plaintiffs at par, however several notes were already in default when purchased or remained in default well after the maturity date and, as such, could not have been valued at par.

47.     State Street's failure to properly settle and execute transactions by receiving value in return for disbursing Plaintiffs' funds was in breach of its legal duties to Plaintiffs as custodian.

**State Street Failed To Take Proper Custody Of The Plaintiffs' Assets**

48.     As custodian, State Street had a duty to Plaintiffs to safeguard Plaintiffs' assets and investments. This included taking proper custody of assets and/or employing reputable subcustodians. Indeed, when a custodian retains a subcustodian, the custodian is responsible for ensuring the investors' assets are safe and implementing risk assessments to ensure that the investors' assets are actually transferred to the subcustodian. State Street was responsible for ensuring any subcustodian it retained was a branch of another U.S. bank, foreign bank acting as

custodian or a foreign securities depository in which it participated. Moreover, State Street needed to exercise reasonable care in the selection, retention or monitoring of the subcustodian.

49.     Upon information and belief, State Street retained subcustodians to hold Plaintiffs' assets. One such subcustodian was TAG, which was not an appropriate subcustodian for Plaintiffs' assets.

50.     Furthermore, State Street failed to properly monitor Plaintiffs' assets, both when assets were transferred to a subcustodian, and when State Street maintained custody of the assets.

51.     For example, upon information and belief, State Street represented to Plaintiffs on their account statements that for various investments "**some or all** of this holding is not held in our custody." (emphasis added)   Upon information and belief, various securities referenced on the account statements that State Street issued to Plaintiffs were designated with an "R," meaning that the securities were not in State Street's custody. Upon information and belief, those securities bearing the designation "R" on Plaintiffs' account statements were in the custody of TAG, or TAG Affiliated Companies. Upon information and belief, State Street permitted TAG and/or the TAG Affiliated Companies to maintain custody of securities that were purchased with funds disbursed from Plaintiffs' State Street accounts.

52.     In February 2010, State Street changed the formatting of its account statements to include two new pages of boilerplate disclaimers including the following:

> Assets on this statement described as "**held at source**:" Assets that the [State Street] has agreed to reflect on your accounting statement at your request, but are not held in custody by [State Street]. Information provided on this account statement in connection with such held at source assets was not provided or verified for accuracy by State Street. These assets are displayed for informational purposes only. "R" indicates Held at Source.

This changed meaning for "R" on State Street's monthly account statements to state that "some or all" of the holding was not held at State Street to "held at source" confirms that State Street

lacked knowledge regarding the location of assets it was supposedly in custody of, as well as its failure to monitor its subcustodians.

53.     As a result of this conduct, State Street failed to properly select and monitor the subcustodians it retained and failed to properly safeguard the assets held by the subcustodians, which ultimately resulted in financial damages to Plaintiffs.  Yet, State Street valued those securities at par value which furthered the perpetration of the fraud.

**State Street Misreported The Value Of Plaintiffs' Assets**

54.     The monthly account statements prepared by State Street for its custody clients listed values for each asset and investment.  State Street either misrepresented the value of many of Plaintiffs' assets on its monthly statements, or negligently or grossly negligently reported false values of many of Plaintiffs' assets on such statements.  State Street listed purported promissory notes issued by various TAG Affiliated Companies, including, but not limited to, IEAH, at par value, even though the notes were not in good form as a matter of law or accepted business usage, and were valueless.

55.     For example, State Street listed promissory notes at par value on the account statements it issued to Plaintiffs in instances when the promissory notes were either unsigned, or only signed by TAG, and when the promissory notes were already matured and defaulted, and therefore, the value of the promissory notes should have been significantly discounted.

56.     In April 2011, State Street ultimately acknowledged that it was inaccurately valuing Plaintiffs' assets.  Further, State Street acknowledged that it issued account statements to Plaintiffs referencing values for securities that State Street was no longer comfortable valuing, and that future account statements would no longer assign values to those securities.

**State Street Listed False And Inaccurate Information On Plaintiffs' Monthly Statements**

57.     As stated above, State Street issued account statements to Plaintiffs which referenced fake CUSIP numbers for Plaintiffs' securities.  Many of the securities referenced on the account statements it issued to Plaintiffs did not have CUSIP numbers assigned to them, including many of the promissory notes.  Moreover, many of the CUSIP numbers listed by State Street on Plaintiffs' account statements were not real CUSIP numbers and any reasonable review by State Street would have detected this.

58.     By providing Plaintiffs with account statements listing fake CUSIP numbers, State Street led Plaintiffs to believe that the holdings in their accounts were legitimate securities, as they were assigned a CUSIP number by Standard & Poor's.  The monthly account statements prepared and issued by State Street provided no indication to Plaintiffs that the CUSIP numbers were invalid.  State Street deliberately concealed and failed to disclose to Plaintiffs that most of the CUSIP numbers for their investments were fake.

**State Street Collects Excessive Custodian Fees
Based On The Value Of Worthless Securities**

59.     State Street charged Plaintiffs a custodial fee which was computed based on a percent of the value of Plaintiffs' assets held by State Street that were listed on the account statements State Street sent to Plaintiffs.

60.     State Street improperly charged Plaintiffs custodian fees based upon the inflated assets which were inaccurately valued by State Street on account statements when State Street knew, or should have known, that the valuations for the notes and subordinated notes were inflated and stale.  State Street acknowledged this unlawful action when it disclosed that it was inaccurately valuing the securities on Plaintiffs' account statements in its April 2011 correspondence.

**State Street Admits To Its Wrongful Conduct**

61.     In or about February 2011, Plaintiffs received a letter from State Street informing them that TAG, Tagliaferri and Cornell were named as Defendants in a lawsuit.  State Street's letter stated the following:

> As you may be aware, in late December 2010 a lawsuit was filed against TAG Virgin Islands, Inc. ("TAG") and its principal officers, James Tagliaferri and Patricia Cornell, among others, by certain of TAG's clients.  The lawsuit accuses Mr. Tagliaferri, among other things, of breaching contractual and legal duties owed to the clients, including effecting transactions which the clients had not authorized, and violation of state and federal securities laws in connection with his management of the clients' accounts.  Certain other TAG clients have also contacted us and expressed concerns about TAG or about the manner in which their accounts have been managed.

62.     Thereafter, in April 2011, Plaintiffs received notification from State Street that it did not receive valuation instructions from TAG, Tagliaferri and Cornell for certain assets since November 20, 2010 and for warrants since July 30, 2010.  State Street also notified Plaintiffs that "as a result of our inability to obtain current valuations from TAG, Tagliaferri and Cornell, we will no longer assign a value to the above referenced assets commencing with your April 2010 account statement. The account statement will indicate a value of zero with respect to these assets."

## CAUSES OF ACTION

## COUNT I – BREACH OF CONTRACT

63.     Plaintiffs re-allege and incorporate by reference herein Paragraphs 1 through 62 above.

64.     Plaintiffs and State Street are parties to an agreement pursuant to which State Street was required to carry out its duties and responsibilities as custodian to hold and safeguard Plaintiffs' assets.

65.     The agreement is a valid and enforceable agreement between Plaintiffs and State Street.

66.     Plaintiffs fully performed their obligations under the agreements.

67.     State Street breached the agreement by acting with negligence, gross negligence and/or willful misconduct when it:

a)  disbursed Plaintiffs' funds in exchange for securities that were facially irregular as they were not in good form as a matter of law and accepted business practice;

b)  disbursed Plaintiffs' assets to TAG to purchase shares of stock that were never received by State Street, or transferred into Plaintiffs' accounts, on a timely basis;

c)  disbursed Plaintiffs' assets without taking custody of the securities it received in exchange for the disbursement, or entrusting those securities to a qualified and independent subcustodian;

d)  inaccurately valued Plaintiffs' investments on the account statements it issued to Plaintiffs;

e)  listed fake and phony CUSIP numbers on the account statements it issued to Plaintiffs; and

f)  charged excessive custodial fees based upon inflated asset values.

68.     As a direct and proximate result of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial, but no less than $4,500,000.

**<u>COUNT II – NEGLIGENCE AND/OR GROSS NEGLIGENCE</u>**

69.     Plaintiffs re-allege and incorporate by reference herein Paragraphs 1 through 68 above.

70.     State Street owed a duty of care to Plaintiffs to maintain custody of their assets

and safeguard Plaintiffs' investments against misappropriation and misuse by TAG.

71.     State Street was negligent and/or grossly negligent, and breached the duty of care it owed to Plaintiffs, when it:

   a)  disbursed Plaintiffs' funds in exchange for securities that were facially irregular as they were not in good form as a matter of law and accepted business practice;

   b)  disbursed Plaintiffs' assets to TAG to purchase shares of stock that were never received by State Street, or transferred into Plaintiffs' accounts, on a timely basis;

   c)  disbursed Plaintiffs' assets without taking custody of the securities it received in exchange for the disbursement, or entrusting those securities to a qualified and independent subcustodian;

   d)  inaccurately valued Plaintiffs' investments on the account statements it issued to Plaintiffs;

   e)  listed fake and phony CUSIP numbers on the account statements it issued to Plaintiffs; and

   f)  charged excessive custodial fees based upon inflated asset values.

72.     The breaches of duties owed by State Street were the direct and proximate cause of damages to Plaintiffs.

73.     As a direct and proximate result of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial, but no less than $4,500,000.

## COUNT III – NEGLIGENT MISREPRESENTATION

74.     Plaintiffs re-allege and incorporate by reference herein Paragraphs 1 through 73 above.

75.     State Street, as custodian for Plaintiffs' assets, had a duty to exercise the same

level of care and competence that a reasonable custodian bank would exercise under similar circumstances.

76.     State Street, in breach of these duties, made negligent misrepresentations and/or omissions to Plaintiffs.

77.     Plaintiffs justifiably relied on the information provided by State Street to their detriment, and Defendant failed to exercise reasonable care or competence in communicating this information.

78.     The information that was omitted and/or misrepresented was in the exclusive control of State Street.  Plaintiffs could not, and did not, discover that State Street provided them with false and erroneous information on their monthly account statements.

79.     But for State Street's negligent misrepresentations, Plaintiffs would not have been damaged.

80.     As a direct and foreseeable result of Defendant's negligent misrepresentations, Plaintiffs have been damaged, but no less than $4,500,000.

## COUNT IV – UNJUST ENRICHMENT

81.     Plaintiffs re-allege and incorporate by reference herein Paragraphs 1 through 80 above.

82.     State Street charged excessive custodian fees to Plaintiffs which were calculated based on the securities listed on the account statements, including the defaulted promissory notes, the securities that were not in good form, and the securities that were valueless.  These custodian fees were improperly calculated based upon the inflated asset values of defaulted promissory notes or securities that were not in good form and that were inappropriately reported on the account statements State Street issued to Plaintiffs.

83.     State Street was unjustly enriched by the retention of the excessive and inflated custodian fees at Plaintiffs' expense.

## COUNT V – BREACH OF FIDUCIARY DUTY

84.     Plaintiffs re-allege and incorporate by reference herein Paragraphs 1 through 83 above.

85.     State Street, as custodian, owed Plaintiffs fiduciary duties as a result of taking custody of Plaintiffs' assets.

86.     State Street breached the fiduciary duty it owed to Plaintiffs when it:

a)  disbursed Plaintiffs' funds in exchange for securities that were facially irregular as they were not in good form as a matter of law and accepted business practice;

b)  disbursed Plaintiffs' assets to TAG to purchase shares of stock that were never received by State Street, or transferred into Plaintiffs' accounts, on a timely basis;

c)  disbursed Plaintiffs' assets without taking custody of the securities it received in exchange for the disbursement, or entrusting those securities to a qualified and independent subcustodian;

d)  inaccurately valued Plaintiffs' investments on the account statements it issued to Plaintiffs;

e)  listed fake and phony CUSIP numbers on the account statements it issued to Plaintiffs; and

f)  charged excessive custodial fees based upon inflated asset values.

87.     As a direct and proximate result of the foregoing breaches, Plaintiffs have suffered damages in an amount to be determined at trial, but no less than $4,500,000.

## COUNT VI - AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

88.     Plaintiffs re-allege and incorporate by reference herein Paragraphs 1 through 87 above.

89.     State Street knowingly participated and/or enabled the breach of fiduciary duties of Plaintiffs' investment adviser, TAG.

90.     TAG breached its fiduciary duties to Plaintiffs by failing to invest Plaintiffs' assets in legitimate investments, and instead invested Plaintiffs' assets in highly risky, illiquid and illegitimate investments.

91.     State Street knew that TAG, Tagliaferri and Cornell were acting as Plaintiffs' investment advisors and that they owed a fiduciary duty to Plaintiffs.  State Street also knew that TAG, Tagliaferri and Cornell were transferring Plaintiffs' funds to the TAG Affiliated Companies and masking the fraud under the guise of legitimate investments and notes, rather than investing Plaintiffs' funds in suitable investments such as safe and stable stocks or municipal bonds.

92.     State Street provided substantial assistance to TAG, Tagliaferri and Cornell to breach their fiduciary duties by disbursing Plaintiffs' funds to TAG, Tagliaferri and Cornell.

93.     As a result of the participation in the breach of fiduciary duty by State Street, Plaintiffs now possess illiquid and worthless stock, warrants, and notes that will never be repaid, and therefore, have no value.  Accordingly, Plaintiffs have suffered damages as a result of State Street's conduct, and seek, among other things, compensatory damages.

**PRAYER FOR RELIEF**

94.     WHEREFORE, STEVEN GOLDIN, as Co-Executor of Bernice Goldin's estate, on behalf of Bernice Goldin's IRA, and as Co-Trustee of the Paul Goldin Marital Trust B, and ROCHELLE GOLDIN, as Co-Executrix of Bernice Goldin's estate, on behalf of Bernice Goldin's IRA, and as Co-Trustee of the Paul Goldin Marital Trust B, demand judgment as follows:

a)  On all Causes of Action, damages in an amount to be determined at trial, but no less than $4,500,000, plus interest;

b)  On all Causes of Action, disgorgement of all fees paid to State Street in connection with Plaintiffs' investment portfolio;

c)  On all Causes of Action, pre-judgment interest, post-judgment interest, costs, disbursements, expert fees and attorneys' fees; and

d)  Such other further relief that the Court may deem just, equitable and proper.

**JURY DEMAND**

Plaintiffs respectfully request a trial by jury on all matters so triable.

Dated: New York, New York
       August 14, 2013

Respectfully Submitted,

By:      /s/
        Barry R. Lax (BL1302)
        LAX & NEVILLE LLP
        1450 Broadway, 35th Floor
        New York, NY  10018
        Telephone: (212) 696 – 1999
        Facsimile: (212) 566 – 4531

        *Counsel for Plaintiffs*